# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## 14-13077-EE

**DAVID SNIDER,**

### PLAINTIFF - APPELLANT

### V.

**UNITED STATES STEEL,**

### DEFENDANT - APPELLEE

---

**An Appeal from the United States
District Court for the
Northern District of Alabama**

---

# Brief and Argument of Appellant

**Kimberly R. Dodson, Esquire
Attorney for Appellant**

**OF COUNSEL:
Law Offices of Kimberly R. Dodson, LLC
200 Title Building
300 Richard Arrington Blvd. Jr., North
Birmingham, AL 35203
(205) 252-2500 Telephone
(205) 252-4907 Facsimile
KRD@KDODSONLAW.COM**

## TABLE OF CONTENTS

**Title**                                                                                          **Page**

Certificate of Interested Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

Statement Regarding Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  v

Statement of Subject Matter & Appellate Jurisdiction. . . . . . . . . . . . . . . . . . . .  vi

Statement of the Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

Summary of the Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Conclusion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

i

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

| | |
|---|---|
| **DAVID SNIDER,** | ) |
| | ) |
| **PLAINTIFF - APPELLANT,** | ) |
| | ) |
| **V.** | ) **APPEAL NO. 14-13077-EE** |
| | ) |
| **UNITED STATES STEEL,** | ) |
| | ) |
| **DEFENDANT - APPELLEE.** | ) |

### CERTIFICATE OF INTERESTED PARTIES

The following persons and or entities may have an interest in the outcome of this matter:

1.  David Snider
    Appellant

2.  Kimberly R. Dodson
    Counsel for Appellant

3.  United States Steel
    Appellees

4.  William H. Morrow
    Counsel for Appellee

5.  Honorable Abdul K. Kallon
    United States District Court Judge

/s/ Kimberly R. Dodson
KIMBERLY R. DODSON
Attorney for Plaintiff/Appellant
State Bar I.D. No.:ASB0487-L58D

ii

**<u>OF COUNSEL</u>:**
Law Offices of Kimberly R. Dodson, LLC
200 Title Building
300 Richard Arrington Blvd. Jr., North
Birmingham, AL 35203
(205) 252-2500 Telephone
(205) 252-4907 Facsimile
<u>KRD@KDODSONLAW.COM</u>

## <u>TABLE OF AUTHORITIES</u>

**<u>Citations:</u>**                                                                                                                          **<u>Page</u>**

*Dulaney v. Miami-Dade Cnty.*, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15,18
    481 F. App'x 481, 486, 489 (11th Cir. 2012)

*Holly v. Clairson Indus.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15,18
    *LLC*, 492 F.3d 1247, 1255-56 (11th Cir. 2007)

*Pinckney v. Potter*, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    186F. App'x 919, 925 (11th Cir. 2006)

*Samples v. City of Atlanta*, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix
    846 F.2d 132 (11th Cir. 1988)

*School Board of Nassau County v. Arline,*, . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    S.Ct. 1987 (Out of 11th Cir)

**<u>Statutes:</u>**                                                                                                                          **<u>Page</u>**

Americans with Disabilities Act of 1990 , . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii,13
ADA Amendments Act of 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii,13
Title VII, Civil Rights Act of 1964, as amended , . . . . . . . . . . . . . . . . . . . . . . vii, 13
28 U.S.C. §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii
42 U.S.C. §12101(b)(1).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
42 U.S.C. §12102(3₁)(A)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
42 U.S.C. §12102(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
42 U.S.C. § 12102(3)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
42 U.S.C. §12102(3)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
42 U.S.C. §12111(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
42 U.S.C.§ 12111(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
29 C.F.R. 1630.15(f)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Appendix to Part 1630—Interpretive Guidance on Title I of the Americans. . . . 16
with Disability Act, 29 C.F.R. pt. 1630 App. § 1630.2(l)

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not requested.

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This was an action brought under the Americans with Disabilities Act of 1990 ("ADA"), ADA Amendments Act of 2008 ("ADAA"), and retaliation and hostile work environment in employment pursuant to Title VII of the Act of Congress known as the "Civil Rights Act of 1964," as amended in employment and was within the jurisdiction of the Court under Federal Question Jurisdiction. This appeal was filed on July 9, 2014 from a final judgment entered by the trial court on June 10, 2014 and is within this Court's jurisdiction under 28 U.S.C. §1291.

<u>STATEMENT OF THE ISSUES</u>

I.    WHETHER THE DISTRICT COURT ERRED IN DETERMINING THAT THE APPELLEE REGARDED THE APPELLANT AS DISABLED.

II.   WHETHER THE DISTRICT COURT ERRED IN SUBJECTIVELY RULING THAT THE APPELLANT WAS UNFIT FOR WORK AND THEREFORE DISQUALIFIED AS A DISABLED PERSON UNDER ADA.

III.  WHETHER THE DISTRICT COURT ERRED IN DENYING APPELLANT'S RETALIATION CLAIM WHEN THE FACTS SUPPORT THAT THE APPELLEE FORCED THE APPELLANT ON MEDICAL LEAVE FROM APRIL 18, 2010 UNTIL FEBRUARY, 2011 REQUIRED HIM TO SEE A PSYCHIATRIST, UNDERGO PSYCHOLOGICAL TESTING, AND ANGER MANAGEMENT TRAINING WITHOUT CAUSE AND IN RETALIATION FOR HIS FILING A UNION GRIEVANCE AND EEOC CHARGE OF DISCRIMINATION.

1

<u>**S**TANDARD OF **R**EVIEW</u>

The granting of Motions For Summary Judgment are reviewed *de novo*. The refusal to admit evidence under Fed.R.Evid. 701 is reviewed under the abuse of discretion standard. *See Samples v. City of Atlanta*, 846 F.2d 132 (11th Cir. 1988).

2

<u>STATEMENT OF THE CASE</u>

<u>COURSE OF PROCEEDINGS AND DISPOSITION BELOW</u>

This case was filed on November 29, 2012 alleging the Americans with Disabilities Act of 1990 ("ADA"), and retaliation and hostile work environment in employment pursuant to Title VII of the Act of Congress known as the "Civil Rights Act of 1964," as amended . (Doc 5) On December 21, 2012, the Appellee filed a Motion to Dismiss the Complaint, or in the Alternative for Summary Judgment and Brief in Support of Motion to Dismiss.  (Doc 8)  The Appellee filed an Answer. After the completion of discovery, the Appellee filed a Motion For Summary Judgment on February 28, 2014 (Doc 30)  The Appellant filed a response to the Motion For Summary Judgment. (Doc 35). The Appellee filed a reply.  (Doc 39)  On June 10, 2014, the Court entered an Order and Memorandum Opinion granting defendant's Motion for Summary Judgment. (Doc 43)  On July 9, 2014, Appellant filed this appeal. (Doc 46-1).

3

## SUMMARY OF THE ARGUMENT

The District Court ignored the fundamental principles of the ADA on the basis of a perception of a disability. Second, the District Court erred in establishing that the Appellant was not disabled under the ADA, when Appellant's claims were that the Appellee perceived the Appellant as disabled.  Third, the District Court erred in subjectively ruling that the Appellant was unfit for work and therefore disqualified as a disabled person under the ADA.  Fourth, the District Court erred in denying Appellant's retaliation claim when the facts support that the Appellee forced the Appellant on medical leave from April 18, 2010 until February, 2011 (without pay), required him to see a psychiatrist, and undergo anger management training without cause.  The Appellant was released to return to work by a licensed psychiatrist one month after he had been placed on medical leave.  The Appellee had no rightful justification for continuing the Appellant's medical leave when he had been returned to work in accordance with the company's policies and procedures.

Therefore, the decision to grant summary judgment should be reversed and the case remanded for trial.

## FACTS

The Appellee's recitation of facts contains facts that are disputed and facts that are not relevant and fails to include some relevant facts. Accordingly, Appellant objects to same and sets forth the following factual recitation.

On January 11, 1988, the Appellant was employed by the Appellee. Throughout his employment he has held the position of Electronic Repairman a/k/a Maintenance Technician (Doc 35; Ex A to Doc 31- Plf Depo P 33)  Appellant's duties as a Maintenance Technician are: call catcher, troubleshooter, and repairman to keep the mill running.  (Doc 35; Ex A to Doc 31- Plf Depo P 30)  On April 18, 2010, the Appellant was forced on medical leave by his employer, the Appellee. (Doc 35; Ex A to Doc 31- Plf Depo P 33) At the time of Appellant's medical leave, his rate of pay was approximately $10,000 per month, including medical insurance and benefits.

On April 10, 2010, was instructed to work under a gantry crane that was in use and did not have safety tape around the perimeter.  (Doc 35; Ex A to Doc 31- Plf Depo P 42) On April 11, 2010, Appellant pulled the video tape of the gantry crane from the day before and told, for safety purposes only,  Isaac Morris, David McKinney, Danny Hanson and Joel Moore that the safety tape was taken down too soon.  (Doc 35; Ex A to Doc 31- Plf Depo P 46-47) During the conversation, based on the workers unwillingness to understand the potential threat to Appellant's safety working under

5

the crane, Appellant said, "I guess it's a good day for me to die because what difference does it make." (Hereinafter the Appellant will refer to this incident as "Bull Gang incident") (Doc 35; Ex A to Doc 31- Plf Depo P 54,57) Appellant did not threaten anyone. (Doc 35; Ex A to Doc 31- Plf Depo P 58, Ex 15) Appellant continued to work until April 14, 2010, wherein there was a meeting between Dave Thompson (Plant Supervisor), Bob Jones (Union Grievance Committeeman) and Jim Schenher (Labor Relations). (Doc 35; Ex A to Doc 31- Plf Depo P 59) During the meeting, Appellant was told that he was not receiving any discipline. (Doc 35; Ex A to Doc 31- Plf Depo P 61) Appellant returned to work and worked the next day. (Doc 35; Ex A to Doc 31- Plf Depo P 64)

On April 16, 2010, Appellant was told to report to the medical center to meet with the company physician, Dr. Szabo. (Doc 35; Ex A to Doc 31- Plf Depo P 64) Dr. Szabo, USS Medical Director, is board certified in family practice and occupational medicine. (Doc 31 Szabo Depo P 9) Dr. Szabo has never worked in a psychiatry clinic or counseling clinic. (Doc 31 Szabo Depo P 10) There is no licensed psychiatrist on staff at USS. (Doc 31 Szabo Depo P 10) Dr. Szabo advised the Appellant that the company required him to take anger management. (Doc 35; Ex A to Doc 31- Plf Depo P 65,68) Appellant responded by saying "[o]kay, if management requires it then I will do what I am told to do by management." (Doc 35; Ex A to Doc 31- Plf Depo P 68) Dr. Szabo did

6

not tell the Appellant that he would be locked out on Code 3 Medical or that she was referring him to EAP for psychiatric evaluation and treatment. (Doc 35; Ex A to Doc 31- Plf Depo P 65,67)  Appellant understood that he was to take an anger management class at EAS <u>only</u>.  (Doc 35; Ex A to Doc 31- Plf Depo P 69)  Appellant had never been to EAS before nor taken an anger management class.  (Doc 35; Ex A to Doc 31- Plf Depo P 70)

On April 18, 2010 (eight days after the Bull Gang incident), the next scheduled work day, the Appellant was locked out from the plant.  He was told by the security guard and the was barred from the plant because he had been placed on medical leave. (Doc 35; Ex A to Doc 31- Plf Depo P 70)

On April 19, 2010, Appellant and his wife went to his scheduled EAS appointment. (Doc 35; Ex A to Doc 31- Plf Depo P 72)  Upon his arrival he was required to fill out HIPPA forms authorizing a full and complete psychological profile, with no specific purpose identified. (Doc 35; Ex A to Doc 31- Plf Depo P 73-74) Bob Kellum (EAP Coordinator) told Appellant that it was a good thing that he did not sign the HIPPA forms because he would have given full consent to the evaluations and the release of the information.  Appellant's signed HIPPA forms were altered by the Appellee. (Doc 35; Ex A, D to Doc 31- Plf Depo P 73)

The Appellee notified him by telephone that he was being referred to a social counselor, Tony Martin. (Doc 35; Ex A to Doc 31- Plf Depo P 80) Appellant went to the

scheduled appointment and learned that Tony Martin was not a psychiatrist but a counselor.    Appellant told Mr. Martin that he was being required to see a licensed psychiatrist by his employer and he wanted an appointment with a licensed psychiatrist because he wanted to get back to work. (Doc 35; Ex A to Doc 31- Plf Depo P 81,83) Mr. Martin scheduled an appointment with a psychiatrist with EAS but it was three months away.  (Doc 35; Ex A to Doc 31- Plf Depo P 85,91)  The USS representative who referred Appellant to Tony Martin was James J. Schenher and Dr. Szabo. (Doc 35; Ex B)

Due to the fact that Appellant's appointment with the associate psychiatrist was a long time off, Appellant, in an attempt to return to work, made an appointment with Dr. Leesha Ellis-Cox, a licensed psychiatrist. (Doc 35; Ex A to Doc 31- Plf Depo P 85)  On May 4, 2010, Appellant had a consultation with Dr. Leesha Ellis-Cox, with Alabama Psychiatric Services.  Through Dr. Cox and her staff of psychologists,  Appellant underwent several days of psychological testing. (Doc 35; Ex A to Doc 31- Plf Depo P 95-96) Dr. Cox informed the Appellant that she did not see anything wrong with him other than he was a "little bit stubborn" and told him she was writing a letter to put him back to work without restrictions.  (Doc 35; Ex A to Doc 31- Plf Depo P 95-96) On May 24, 2010, Dr. Cox wrote in her notes, "cleared to return to work - no evidence of harm to self or others, psychosis, chronic anger issues."  (Doc 31 Szabo Depo Ex

10:18)

On May 24, 2010, Dr. Cox wrote a letter *releasing* Appellant back to work without restrictions. (Doc 35; Ex A to Doc 31- Plf Depo P 93, Ex 4) Appellant took a copy of the letter to Dr. Szabo and Bob Jones. (Doc 35; Ex A to Doc 31- Plf Depo P 101) After Dr. Szabo received Dr. Cox's May 24th return to work letter, Dr. Szabo telephoned Dr. Cox and had discussions with her without the Appellant's consent or a HIPPA authorization. (Doc 31 Szabo Depo P 42,44)

After Appellant received the May 24, 2010 letter from Dr. Cox releasing him back to work, Appellant was never advised by Dr. Cox or Dr. Szabo that Dr. Szabo had communicated with Dr. Cox, or sent personnel and medical records in an attempt to have Dr. Cox rescind her May 24, 2010 return to work letter. Nor, did the Appellant know that there was any additional therapy that he was to undergo until he was presented with the Memorandum of Understanding (MOU) on July 1, 2010. (Doc 35; Ex A to Doc 31- Plf Depo P 113-14, 116, 120 Ex 7)

There is no written policy or procedure wherein an employee is not allowed to be treated by their own psychiatrist versus being treated by EAS and Grayson & Associates. (Doc 31 Szabo Depo P 39,40) According to Dr. Szabo, procedurally an employee will be returned to work once released from EAS or by a doctor referred to by EAS.(Doc 31 Szabo Depo P 36-37)

9

On May 24, 2010, June 8, 2010, July 19, 2010, August 18, 2010, and October

7, 2010 Appellant was <u>forced</u> by James Schenher and/or the Appellee to sign medical

authorizations allowing Dr. Szabo and/or the Appellee to obtain all of Appellant's

medical records and psychiatric notes from Dr. Cox. (Doc 35; Ex A to Doc 31- Plf Depo

P 113-14, 116, 120 Ex 4)

On June 3, 2010, Appellant was seen by Dr. Cox and Dr. Cox wrote in her

medical notes, "**per Szabo work is requiring the psychiatric evaluation come from**

**Tony Martin only, had to sign ROI**." (Doc 31 Szabo Depo Ex 10:19)(Doc 35; Ex A (Doc

35; Ex C).  On June 4, 2010, Dr. Cox wrote in her notes, "**Reversed aborn. pt needs**

**to comply w work's requirements as stated to him.  Not much we can do on this**

**unfortunately."**(Doc 31 Szabo Depo P 10:19)(Doc 35; Ex C).  On June 8, 2010, Dr. Cox

wrote in her notes, "access to his information...unauthorized access feels unfair 1)

encouraged pt to talk to employer & HR 2) also recommended consulting an attorney

if he has questions about illegal actions on the part of particular individuals." (Doc 35;

Ex 10:19) (Doc 35; Ex C).

In June 6, 2011, letter from S&A Claims, Appellant was advised that is benefits

ended October 12, 2010, even though he was still on medical leave. (Doc 35; Ex 13:3)

On June 8, 2010, Appellant signed a HIPPA form that was for "any & all records,

notes, summaries, etc. from April 11, 2010 to present [June 8, 2010]". (Doc 35; Ex A

to Doc 31- Plf Depo P 108 Ex 1) Even though the Appellant had been released back to work without restrictions by Dr. Cox, Dr. Szabo continued to talk to Dr. Cox after June 8, 2010 in violation of Appellant's HIPPA and his belief of the purpose of the HIPPA. (Doc 35 Plf Depo P 108 Ex 5)

On June 10, 2010, Dr. Szabo sent a seventeen page facsimile to Dr. Cox which included old medical records and personnel records that dated from 1995 to 2000 or the Appellant.  (Doc 31 Szabo 29-33,35 Depo Ex 2) Dr. Szabo did not have a medical authorization in place allowing her to send Appellant's medical and personnel records to Dr. Cox without his permission.  (Doc 31 Szabo Depo P 45) Dr. Szabo admits that the Appellant did not come on his free will but was required to by his employer, which limits Appellant's consent of the release of his medical records.  (Doc 31 Szabo Depo 45) On June 11, 2010, one day after Dr. Szabo sent the 17 page facsimile and without re-evaluating the Appellant, Dr. Cox wrote a letter to Dr. Szabo "In response to your concerns regarding the return to work of David Snider and possible recommendations for his employment future" and stated "At this time, No Axis I diagnosis can be offered as there is insufficient evidence to support it." (Doc 35 Plf Depo P 53 Ex 5)

On June 17, 2010 and September 14, 2010, Dr. Szabo sent a fax asking for the date and time of Appellant's therapy appointments and his obtaining anger management courses. (Doc 31 Szabo 61,64 Depo Ex 5,6,7)  On June 23, 2010, through a

letter from S&A Claims, Appellant was advised that Dr. Szabo had Appellant's S&A benefits cutoff. (Doc 35 Plf Depo P 102 Ex 13) On or about July 1, 2010, Appellant was told by James Schenher and Dave Thompson that if Appellant wanted to return to work he had to sign a MOU which stated untruths such as: (1) that Appellant had been deemed medically unfit for work, then chose his own medical provider, who conditionally released Appellant to work; and (2) "employee's current provider" has developed a long-term treatment plan to address his condition and how he interacts with others in the workplace. (Doc 35 Plf Depo P 133-36 Ex 7)

The MOU states that if the Appellant fails to comply with the terms of the MOU, then the Appellant would be immediately removed from the plant. (Doc 35 Plf Depo P 128) Dr. Szabo added language to the MOU regarding Appellant continuing treatment, when Appellant did not even know that he was to continue any treatment because he had not been advised by his physicians or management. (Doc 35 Plf Depo P 133) On July 29, 2010, Bob Jones, Grievance Committeeman of United Steelworkers Local 1013, wrote a letter on Appellant's behalf stating: "As of July 29, 2010, Mr. David Snider has not had any discipline of any sort in the previous three years and to the best of my knowledge has not received any discipline in the last five years for any rules violation. Dr. Cheryl Szabo has had a history of mis-diagnosing employee's that Local 1013 represents and we have a large file of those cases on

12

hand." (Doc 35 Ex G)

On September 2, 2010, Appellant completed and received a Certificate of Completion of the anger control training that lasted six weeks that he was forced to complete by the Appellee.(Doc 35 Plf Depo P 143 Doc 31 Szabo Depo Ex 7:2) On October 1, 2010, Dr. Cox wrote a third letter releasing the Appellant to return to work without restrictions. (Doc 31 Szabo 73 Depo Ex 8) On October 7, 2010, even after Appellant had been released to return to work for the second time, Appellant was forced by Jim Schenher to sign a medical authorization allowing Dr. Szabo to obtain all of Appellant's medical records and psychiatric notes from Dr. Cox, with Alabama Psychiatric Services. (Doc 35 Ex D)

On October 12, 2010, Dr. Cox at the request of Dr. Szabo provided a follow-up letter to her October 1, 2010 letter again releasing Appellant back to work without restrictions effective immediately and stating the treatment that he had received at APS. (Doc 35 Plf Depo Ex 9; Szabo Depo P 74; Ex 9) Dr. Szabo testified that she did not know why the Appellant was not returned back to work and taken off Code 3 Medical until February, 2011. (Doc 31 Szabo P 84-84) Even though Dr. Szabo claimed that medical was done with the process of having the Appellant on leave, she continued to communicate with Labor Relations and did not facilitate his return to work. (Doc 31 Szabo P 84-85)

13

On January 18, 2011, Appellant was forced to sign the MOU.   (Doc 35 Plf Depo

Ex 15) In signing the MOU, Bob Jones attested to Appellant stating that  management

took the comment he made to the Bull Gang out of context and that it was not said in

a threatening manner.  (Doc 35 Plf Depo Ex 15) On January 21, 2011, Jim Schenher

wrote a letter to Bob Jones, Chairman of Grievance Committee stating: "If U.S. Steel,

The United Steelworker's Union, and Mr. Snider can reach an agreement resolving

the current grievances, complaints, and any other charges relating to the events of

April 2010, in full and final settlement, then I believe we can resolve this matter and

return Mr. Snider to work."  (Doc 35 Ex K)

On January 31, 2011, Appellant is informed that all of his medical insurance

on his family has been cancelled by the Appellee.  (Doc 35 Ex A)  On February 1, 2011,

Dr. Szabo took Appellant off work on Medical Code 3.  (Doc 35 Plf Depo P 74 Ex 9) On

February 6, 2011, finally, Appellant was returned to work.  (Doc 35 Plf Depo P 36)

When Appellant returned to work, he learned that his locker had been cleaned out and

items in his work area had been removed. (Doc 35 Plf Depo P 37) Appellant's co-

workers were happy to see Appellant return to work because parts of the mill were

shut down due to need for repairs, which make the workers' job harder.  (Doc 35 Plf

Depo P 40)  Labor Relations nor management stated to Dr. Szabo that they witnessed

the Appellant threaten anyone.  (Doc 31 Szabo Depo P 23) Dr. Szabo does not know of

14

any investigation that was conducted as to the alleged threatening comments made by Appellant.  (Doc 31 Szabo Depo P 23,24)

Even though Dr. Szabo had been treating Appellant as the company doctor, at no time prior to the Bull Gang comment had she ever gone to management or Labor Relations because she felt the was a threat to himself or his co-workers.  (Doc 31 Szabo Depo P 24,72) Dr. Szabo received the September 2, 2010 letter from Impact Family Counseling advising that Appellant had completed a six week Anger Control Training course which followed the nationally recognized Anger Control Training curriculum. (Doc 31 Szabo Depo P 65,67-68 Ex 7:2)  Dr. Szabo admitted she was the person who kept the Appellant off work on Code 3 Medical leave even tough he was attending counseling sessions with a psychologist, being seen by a psychiatrist and was attending an Anger Management course.  (Doc 31Szabo Depo P 69-70)

## ARGUMENT

I.    WHETHER THE DISTRICT COURT ERRED IN DETERMINING THAT THE APPELLEE REGARDED THE APPELLANT AS DISABLED.

The facts are sufficient to demonstrate an ability to prove a *prima facie* case of discrimination.  The Appellee violated the "Americans with Disabilities Act" by discriminating against the Appellant based on a perceived disability. A person is regarded as disabled when he (1) has an impairment that does not substantially limit major life activities but is treated by his employer as constituting such limitation; (2)

15

has an impairment that substantially limits major life activities only as a result of the altitudes of others toward such impairment; or (3) has no illness or malady defined by the EEOC, but is treated by his or her employer as having a substantially limiting impairment.  A person is **regarded as disabled** when he (1) has an impairment that does not substantially limit major life activities but is treated by his employer as constituting such limitation; (2) has an impairment that substantially limits major life activities only as a result of the altitudes of others toward such impairment; or (3) has not illness or malady defined by the EEOC but is treated by his or her employer as having a substantially limiting impairment.  Appellee's conduct of perceiving the Appellant as disabled proximately caused the Appellant to suffer embarrassment, humiliation, shame, damage to reputation, mental distress, emotional and physical pain and anguish and lost wages and other pecuniary losses.

The Appellant can show that the Appellee regarded the Appellant as disabled by:  (1) forcing the Appellant on medical leave; (2) paying him Sick and Accident Benefits (S&A); (3) forcing the Appellant to undergo psychiatric treatment; (4) forcing the Appellant to undergo anger counseling; and (5) not allowing the Appellant to return to work for over ten months without pay. Clearly, the Appellant's working conditions were altered by the Appellee, who regarded the Appellant as impaired.

16

1.     "Regarded As" Disability.

The purpose of the ADA is to "eliminat[e] . . . discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). "'[I]n this Circuit, the burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims.'" *Dulaney v. Miami-Dade Cnty.*, 481 F. App'x 486, 489 (11th Cir. 2012) (quoting *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1255 (11th Cir. 2007)). "Under this burden-shifting analysis, the plaintiff must first establish a *prima facie* case of discrimination under the ADA by showing (1) he is disabled, (2) he is a qualified individual, and (3) he was subjected to unlawful discrimination because of his disability." *Id.* (citing *Holly*, 492 F.3d at 1255–56).

The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1). An individual is **"regarded as"** disabled "if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment . . . ." 42 U.S.C. § 12102(3[1])(A).  The ADA provides that either an actual or perceived impairment may

_____

[1]Until recently, the ADA required a plaintiff alleging a 'regarded as' claim to prove that the perceived impairment "substantially limited a major life activity." 42 U.S.C. §12102(2) (2008), *amended by* ADA Amendments Act (ADAAA) of 2008, Pub. L. No. 110-325, 2008 Stat. 3406 (2008) (codified as amended at 42 U.S.C. §§ 12101–12102). The ADAAA explicitly

give rise to a 'regarded as' disabled claim. 42 U.S.C. § 12102(3)(A). The court observes, however, that it is often the case that an actual impairment, insignificant though it may be, gives rise to a perceived impairment.   The EEOC's Interpretive Guidance to the ADA, which clearly indicates the drafters of the original ADA understood that: unfounded concerns, mistaken beliefs, fears, myths, or prejudice about disabilities are often just as disabling as actual impairments, and . . . corresponding[ly] desire[d] to prohibit discrimination founded on such perceptions. In passing the original ADA, Congress relied extensively on the reasoning of *, Board of Nassau County v. Arline,* S.Ct. 1987 that the negative reactions of others are just as disabling as the actual impact of an impairment. The ADAAA reiterates Congress's reliance on the broad views enunciated in that decision, and Congress believe[s] that courts should continue to rely on this standard. Accordingly, the ADA Amendments Act *broadened* the application of the "regarded as" prong of the definition of disability. Appendix to Part 1630—Interpretive Guidance on Title I of the Americans with Disability Act, 29 C.F.R. pt. 1630 App. § 1630.2(l) (emphasis added) (citations omitted) (internal quotation marks omitted).

---

eliminated the substantial limitation requirement for 'regarded as' claims. *See* 42 U.S.C. §12102(3)(A) (stating that an individual who is 'regarded as' disabled is considered disabled under the ADA, "whether or not the impairment limits or is perceived to limit a major life activity").

2.    "Transitory and Minor".

Furthermore, the district court argued the issue of whether the Appellant's impairment was "transitory and minor".  This issue  is to be determined objectively. A covered entity may not defeat "regarded as" coverage of an individual simply by demonstrating that it subjectively believed the impairment was transitory and minor; rather, the covered entity must demonstrate that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) both transitory and minor. 29 C.F.R. 1630.15(f).    Because, the Appellee continued to place the Appellant on medical leave for over ten months before allowing him to return to work, the Appellee cannot argue the defense that the Appellant's impairment was "transitory and minor".  Nor, should the district court have considered this as a defense for the Appellee's wrongful actions against the Appellant.  Ten months is ten months, not less than six months.  The Appellee indisputably perceived that the Appellant suffered from an impairment that was not 'transitory and minor.' As explained above, an impairment is 'transitory' if its "actual or expected duration [is] 6 months or less." 42 U.S.C. §12102(3)(B).  Moreover, even if the court conducted the 'transitory and minor' analysis advocated by the Appellee, summary judgment would be improper because there is a genuine issue of material fact regarding whether the Appellant's actual impairment was 'transitory *and* minor.'

19

II.    WHETHER THE DISTRICT COURT ERRED IN SUBJECTIVELY RULING THAT THE APPELLANT WAS UNFIT FOR WORK AND THEREFORE DISQUALIFIED AS A DISABLED PERSON UNDER THE ADA.

In addition to showing that he is disabled, to establish a *prima facie* case of discrimination under the ADA, a plaintiff must show he is a qualified individual. *Dulaney*, 481 F. App'x at 489 (citing *Holly*, 492 F.3d at 1255–56). A qualified individual is one "who, with or without reasonable accommodations can perform the essential functions of the position that such individual holds or desires." 42 U.S.C. § 12111(8).   At the time the Appellant was placed on medical leave, he had been employed with the Appellee for over twenty-two years.  (Doc 35 P 9) The Appellant had never been written up or disciplined for not being able to perform the functions of his job.  To the contrary, the Appellant has continued to work since he was taken off medical leave in February, 2011 in the position that he held prior to the Bull Gang incident.   The Appellee allowed the Appellant to work eight days without any alterations to his position, without discipline, without restrictions, or without a write-up before placing him on medical leave.  Surely, if the Appellee truly thought he was a direct threat to his co-workers, they would have quickly acted in a manner to ensure the safety of his co-workers.  Ironically, no action was taken by the Appellant's direct supervisors, in accordance with company policy, because not one single co-worker complained that he/she felt threatened.  The Court must beg the question: if there was

20

a threat, why was the Appellant not written-up and removed from the job site immediately?

A disabled individual cannot be qualified for a specific job if he poses a "direct threat" to the health or safety of himself or others that cannot be eliminated by reasonable accommodations. 42 U.S.C. §12111(3); *see also Pinckney v. Potter*, 186 F. App'x 919, 925 (11th Cir. 2006). The ADA defines a "direct threat" as a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodations." 42 U.S.C. § 12111(3). Whether the Appellant posed a direct threat, presents a question of material fact.

The district court's decision is wrought with negative connotations as to the facts surrounding the Bull Gang incident.   For instance, the court opined that the Appellant "decided to challenge the decision because the crane purportedly appeared unstable and presented a safety hazard".  The facts set out to the court were that the tape was a violation of safety standards.  The whole basis for the Appellant being locked out of the plant, placed on medical leave (without pay), forced to undergo psychological testing,  and anger management was due to the comment made during the Bull Gang incident.  The Appellant's comment was "it's a good day [for me] to die" or "I guess it's a good day [for me] to die." (Doc.   at 3).  The Appellee allege

that their investigation revealed that the Appellant's comment was "today is a good day for someone to die." Neither comment gives rise to a direct threat. The district court's determination that the comment, which clearly is in dispute, overstepped the bounds of the court. Bull Gang comment is what led to the adverse treatment which prompted the EEOC filing and lawsuit. A jury should have been the trier of the facts, not the district court.

III. WHETHER THE DISTRICT COURT ERRED IN DENYING APPELLANT'S RETALIATION CLAIM WHEN THE FACTS SUPPORT THAT THE APPELLEE FORCED THE APPELLANT ON MEDICAL LEAVE FROM APRIL 18, 2010 UNTIL FEBRUARY, 2011 REQUIRED HIM TO SEE A PSYCHIATRIST, UNDERGO PSYCHOLOGICAL TESTING, AND ANGER MANAGEMENT TRAINING WITHOUT CAUSE AND IN RETALIATION FOR HIS FILING A UNION GRIEVANCE AND EEOC CHARGE OF DISCRIMINATION.

Albeit, the Appellant was able to return to work, but he was damaged by the Appellee's adverse actions. The Plaintiff was forced on medical leave from April, 2010 until February, 2011 without cause and in retaliation for his filing a union grievance and EEOC charge of discrimination. Even after, Dr.Cox licenswed psychiatrist wrote a letter on May 24, 2010 releasing Plaintiff back to work without restrictions, the Appellee continued the Plaintiff on *involuntary* medical leave without pay. (Doc 35 Plf Depo P 93; Ex 4) After Dr. Szabo received Dr. Cox's May 24th return to work letter, Dr. Szabo telephoned Dr. Cox and had discussions with her without

22

the Plaintiff's consent or a HIPPA authorization.  (Doc 31 Szabo Depo P 42,44) After

Plaintiff received the May 24, 2010 letter from Dr. Cox releasing him back to work,

Plaintiff was never advised by Dr. Cox or Dr. Szabo that Dr. Szabo had

communicated with Dr. Cox, or sent personnel and medical records in an attempt to

have Dr. Cox rescind her May 24, 2010 return to work letter.  Nor, did the Plaintiff

know that there was any additional therapy that he was to undergo until he was

presented with the MOU on July 1, 2010.  (Doc 35 Plf Depo P 113-14,116,120 Ex 7)  There

is no written policy or procedure wherein an employee is not allowed to be treated by

their own psychiatrist versus being treated by EAS and Grayson & Associates.  (Doc

31Szabo Depo P 39,40) According to Dr. Szabo,  procedurally  an employee will be

returned to work once released from EAS or by a doctor referred to by EAS.  (Doc 31

Szabo Depo P 36-37

On May 24, 2010, June 8, 2010, July 19, 2010, August 18, 2010, and October

7, 2010 Plaintiff was forced by James Schenher and/or the Appellee to sign medical

authorizations allowing Dr. Szabo and/or the Appellee to obtain all of Plaintiff's

medical records and psychiatric notes from Dr. Cox.  (Doc 35 Plf Depo P 103; Ex 4)  The

June 8, 2010, Plaintiff signed a HIPPA form that was for "any & all records, notes,

summaries, etc. from April 11, 2010 to present [June 8, 2010]".  (Doc 35 Plf Depo P

23

103,08; Ex 1)Even though the Plaintiff had been released back to work without restrictions by Dr. Cox, Dr. Szabo continued to talk to Dr. Cox after June 8, 2010 in violation of Plaintiff's HIPPA and his belief of the purpose of the HIPPA.   (Doc 35 Plf Depo P 108 Ex 5) In June 6, 2011, letter from S&A Claims, Plaintiff was advised that is benefits ended October 12, 2010, even though he was still on medical leave.  (Doc 35 Plf Depo Ex 13:3)

In an attempt to manipulate Dr. Cox's diagnosis of the Plaintiff, on June 10, 2010, Dr.  Szabo sent a seventeen page facsimile to Dr. Cox which included old medical records and personnel records that dated from 1995 to 2000 or the Plaintiff. (Doc 31 Szabo Depo P 29-33,35 Ex 2) Dr. Szabo did not have a medical authorization in place allowing her to send Plaintiff's medical and personnel records to Dr. Cox without his permission.  (Doc 31 Szabo Depo P 45) Dr. Szabo admits that the Plaintiff did not come on his free will but was required to by his employer, which limits Plaintiff's consent of the release of his medical records.  (Doc 31 Szabo Depo P 45) Dr. Szabo knowingly and willing interfered with the Dr. Cox's treatment of the Plaintiff. Dr. Szabo violated Plaintiff's HIPPA rights by: (1) contacting Plaintiff's private physician (Dr. Cox) without his knowledge or consent; (2) sending by facsimile medical records to Dr. Cox without Plaintiff's knowledge or consent; (3) sending

personnel records to Dr. Cox without Plaintiff's knowledge or consent; (4) having discussions with Labor Relations regarding Plaintiff's medical records.

On June 11, 2010, based solely on the manipulation of Dr. Szabo, only one day after Dr. Szabo sent the 17 page facsimile and without re-evaluating the Plaintiff, Dr. Cox wrote a letter to Dr. Szabo stating: "In response to your concerns regarding the return to work of David Snider and possible recommendations for his employment future" and stated "At this time, No Axis I diagnosis can be offered as there is insufficient evidence to support it." (Doc 35 Plf Depo P 53 Ex 5) On June 17, 2010 and September 14, 2010, Dr. Szabo sent another fax asking for the date and time of Plaintiff's therapy appointments and his obtaining anger management courses. (Doc 31 Szabo Depo P 61,64 Ex 5,6,7) On June 23, 2010, Plaintiff was seen by Dr. Cox and Dr. Cox wrote in her medical notes that the Plaintiff's employer, the Appellee, was requiring anger management regardless of her releasing the Plaintiff to return to work.

In further retaliation, on June 23, 2010, through a letter from S&A Claims, Plaintiff was advised that Dr. Szabo had Plaintiff's S&A benefits cutoff. (Doc 35 Plf Depo P 102 Ex 13) On or about July 1, 2010, in an attempt to terminate the Plaintiff, the Plaintiff was told by James Schenher and Dave Thompson that if Plaintiff wanted to return to work he had to sign the MOU. Plaintiff refused to sign the MOU because

it stated <u>untruths</u> such as: (1) that Plaintiff had been deemed medically unfit for work, then chose his own medical provider, who conditionally released Plaintiff to work; and (2) "employee's current provider" has developed a long-term treatment plan to address his condition and how he interacts with others in the workplace.  (Doc 35 Plf Depo P 126-28, 133-36 Ex 7) At the time that the Plaintiff was presented with the MOU, he was unaware that Dr. Szabo was communicating both orally and in writing with Dr. Cox  because he had not authorized Dr. Szabo to have communications with Dr. Cox.  He had not especially not authorized Dr.Szabo to send personnel and medical records dating back to 1995 and that no bearing on the crane incident in which the Plaintiff allegedly made the threatening comment.

On July 29, 2010, Bob Jones, Grievance Committeeman of United Steelworkers Local 1013 wrote a letter on Plaintiff's behalf stating: "As of July 29, 2010, Mr. David Snider has not had any discipline of any sort in the previous three years and to the best of my knowledge has not received any discipline in the last five years for any rules violation.  Dr. Cheryl Szabo has had a history of mis-diagnosing employee's that Local 1013 represents and we have a large file of those cases on hand."  (Doc 35 Ex G)

On September 2, 2010, Plaintiff completed and received a Certificate of

26

Completion of the anger control training that lasted six weeks. (Doc 35 Plf Depo P 143; Doc 31 Szabo Depo Ex 7:2) On October 1, 2010, Dr. Cox wrote a third letter releasing the Plaintiff to return to work without restrictions. (Doc 31 Szabo Depo P 73 Ex 8) On October 7, 2010, even after the Plaintiff had been released to return to work several times, Plaintiff was forced to sign a medical authorization allowing Dr. Szabo to obtain all of Plaintiff's medical records and psychiatric notes from Dr. Cox. (Doc 35 Ex D)

Even though Dr. Cox had sent the October 1, 2010 letter returning the Plaintiff back to work without restrictions, Dr. Szabo contacted Dr. Cox and demanded an additional letter. Therefore, on October 12, 2010, Dr. Cox at the request of Dr. Szabo provided a follow-up letter to her October 1, 2010 letter again releasing Plaintiff back to work without restrictions effective immediately and stating the treatment that he had received at APS. (Doc 35 Plf Depo Ex 9; Szabo Depo P 74; Ex 9) Ironically, Dr. Szabo had interfered with the Plaintiff's treatment and did not return the Plaintiff back to work after receiving the May 24th letter, Dr. Szabo testified that she did not know why the Plaintiff was not returned back to work and taken off Code 3 Medical until February, 2011. (Doc 31 Szabo Depo P 83-84) Even though Dr. Szabo claimed that medical was done with the process of having the Plaintiff on leave, she continued to

27

communicate with Labor Relations and did not facilitate his return to work.  (Doc 31 Szabo Depo P 84-85)  On January 18, 2011, the Appellee continued to retaliate against the  Plaintiff by forcing to sign a MOU. (Doc 35 Plf Depo Ex 15)In signing the MOU, Bob Jones attested to Plaintiff stating that  management took the comment he made to the Bull Gang out of context and that it was not said in a threatening manner.  (Doc 35 Plf Depo Ex 15)Direct evidence of the Appellee's retaliation and was shown in January 21, 2011, letter written by Jim Schenher  Bob Jones, Chairman of Grievance Committee, stating: "If U.S. Steel, The United Steelworker's Union, and Mr. Snider can reach an agreement resolving the current grievances, complaints, and any other charges relating to the events of April 2010, in full and final settlement, then I believe we can resolve this matter and return Mr. Snider to work."  (Doc 35 Ex K) On January 31, 2011, Plaintiff is informed that all of his medical insurance on his family has been cancelled by the Appellee. (Doc 35 Ex A)

Finally, on February 1, 2011, Dr. Szabo took Plaintiff off work on Medical Code 3  (Doc 35 Plf Depo P 37) and Plaintiff was returned to work on February 6, 2011. (Doc 35 Plf Depo P 36)  When Plaintiff returned to work, he learned that his locker had been cleaned out and items in his work area had been removed.  (Doc 35 Plf Depo P 37) Plaintiff's co-workers were happy to see Plaintiff return to work because parts of the

mill were shut down due to need for repairs, which make the workers' job harder.

(Doc 35 Plf Depo P 40)

Any assertions by the Appellee that the Plaintiff willingly signed *any* HIPPA forms is untrue. The Plaintiff would have never consented to signing a HIPPA form if he was not forced to do so. Furthermore, the Appellee's assertions by the Appellee that the Plaintiff *voluntarily* applied to the Appellee's S&A is simply untrue. Only after the Appellee *forced* the Plaintiff on a Code 3 medical leave and required him to seek psychiatric counseling, did the Plaintiff apply for S&A on May 5, 2010. But for the Plaintiff not being forced on medical leave without pay by the Appellee, the Plaintiff would have never applied for S&A.

The district court's granting of summary judgment was erroneous and must be reversed because it is based upon faulty premises that are absolutely not supported by the record and an incorrect interpretation of the law.

## <u>CONCLUSION</u>

Appellant therefore requests that this Court reverse the district court's Order granting summary judgment and remand this matter for trial.

/s/ Kimberly R. Dodson
KIMBERLY R. DODSON
Alabama State Bar No. ASB-O487-L58D
Attorney for Appellant

29

**OF COUNSEL:**
Law Offices of Kimberly R. Dodson, LLC
200 Title Building
300 Richard Arrington Blvd. Jr., North
Birmingham, AL 35203
(205) 252-2500 Telephone
(205) 252-4907 Facsimile
KRD@KDODSONLAW.COM

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and served a copy of a copy of same by CM/ECF, and I hereby certify that I have mailed by United States Postal Service the document on non-CM/ECF participants on this the 18th day of August, 2014 on the foregoing:

William H. Morrow, Esquire
Lightfoot, Franklin & White, LLC
The Clark Building
400 North 20th Street
Birmingham, AL 35203

/s/ Kimberly R. Dodson
OF COUNSEL

### CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). This brief, including the Statement of the Case, Statement of the Facts, Summary of the Argument and the Argument, contains 6696 words.

/s/ Kimberly R. Dodson
OF COUNSEL